**ROSEBUD SIOUX TRIBE,**
**Appellant-Plaintiff,**

v.

**Honorable Richard KNEIP et al.,**
**Appellees-Defendants.**

**No. 74–1211.**

United States Court of Appeals,
Eighth Circuit.

Submitted April 11, 1975.

Decided July 16, 1975.

Marvin J. Sonosky, Washington, D. C., for appellant-plaintiff.

William F. Day, Jr., and Tom D. Tobin, Winner, S. D., for appellees-defendants.

Neil T. Proto, Dept. of Justice, Washington, D. C., for amicus curiae, United States.

Before GIBSON, Chief Judge, BRIGHT, Circuit Judge, and TALBOT SMITH,* Senior District Judge.

TALBOT SMITH, Senior District Judge.

The complaint before us seeks that we declare that the original "boundaries of the [Rosebud Indian] reservation as fixed by the 1889 Act, were not affected by the three 'surplus' land statutes of 1904, 1907, and 1910."[1] It follows, according to plaintiff's (hereinafter the Tribe's) theory that the areas involved, namely, all or parts of the Counties of Gregory, Tripp, Lyman and Mellette, in the State of South Dakota, remain a part of the Rosebud Reservation and are subject to the appropriate federal and tribal powers and jurisdiction.[2]

As originally delimited the Rosebud Indian Reservation contained over 3 million acres. Three-fourths of this area, all the original reservation outside Todd County, South Dakota, is involved in this action. The three Acts we are asked to construe disposed of all lands in this area which were not allotted to the Indians.[3] Most of the unallotted lands were sold to homesteaders under the terms of the three Acts. About ninety percent of the present population in the disputed area is non-Indian.[4] The defendants Kneip and Mydland, the Governor and Attorney General of South Dakota, assert that the area involved was settled and developed by non-Indians in partial reliance upon the removal of their lands from the

---

* TALBOT SMITH, Senior District Judge, Eastern District of Michigan, sitting by designation.

1. The Act of March 2, 1889, ch. 405, 25 Stat. 888, sometimes referred to as the "General Crooks" or the "Crooks" treaty, established and described the Rosebud Reservation as follows:

> Commencing in the middle of the main channel of the Missouri River at the intersection of the south line of Brule County; thence down said middle of the main channel of said river to the intersection of the ninety-ninth degree of west longitude from Greenwich; thence due south to the forty-third parallel of latitude; thence west along said parallel to a point due south from the mouth of Black Pipe Creek; thence due north to the mouth of Black Pike [sic] Creek; thence down White River to a point intersecting the west line of Gregory County extended north; thence south on said extended west line of Gregory County to the intersection of the south line of Brule County extended west; thence due east on said south line of Brule County extended to the point of beginning in the Missouri River, including entirely within said reservation all islands, if any, in said river.

> *Id.,* § 2, 25 Stat. 888.

By the Act of April 23, 1904, ch. 1484, 33 Stat. 254 [hereinafter the 1904 Act], the Act of March 2, 1907, ch. 2536, 34 Stat. 1230 [hereinafter the 1907 Act] and the Act of May 30, 1910, ch. 260, 36 Stat. 448 [hereinafter the 1910 Act] Congress opened for homesteading and sale all unallotted lands within the original reservation and in Gregory County (1904 Act), in Tripp and Lyman Counties (1907 Act) and in Mellette County (1910 Act). Todd County remains unopened.

For prior history see, *inter alia,* the treaty agreeing upon the establishment of the Great Sioux Indian Reservation, ratified by Congress on February 16, 1869: Treaty with Different Tribes of Sioux Indians, April 29 *et seq.,* 1868, 15 Stat. 635; and the Dawes Act, *infra* note 112.

2. *See generally* 18 U.S.C. § 1151(a); Dept. of the Interior, *Federal Indian Law* 12–13 (1958); *DeCoteau v. District County Court,* 420 U.S. 425, 428–431, 95 S.Ct. 1082, 1085–86, 43 L.Ed. 2d 300 (1975).

3. Fifty-eight percent of the 2.4 million acres outside Todd County were unallotted lands. *See* GAO Report, 4 App. at 467, 469, 471–72.

4. 15,661 non-Indians and 1641 Indians reside in Gregory, Mellette and Tripp Counties. U. S. Bureau of the Census, Census of the Population: 1970; 1 *Characteristics of the Population* Pt. 43, South Dakota, at 91, 92 (1973). Figures are unavailable for the small fraction of Gregory County which lies outside the disputed area and the small fraction of Lyman County which lies within the disputed area.

exterior boundaries of the reservation,[5] and that the Acts in question were intended to and did effectuate the alteration of the reservation boundaries to exclude the areas therein opened for settlement.

The court below rejected the Tribe's tendered theories in support of its argument that the boundaries of the reservation as defined in the Act of March 2, 1889 had not been changed. It held that the surrounding circumstances and legislative history of the Acts made it clear that it was the congressional intent to separate each of the counties concerned and to extinguish the reservation status of those counties. *Rosebud Sioux Tribe v. Kneip,* 375 F.Supp. 1065 (D.S.D.1974). We agree and we affirm.

In view of the many authorities cited to us, we deem it pertinent to note at the outset that they are of limited utility and we comment only on those deemed relevant to decision herein. Save as to broad generalities the holding in any particular case will depend upon circumstances applicable to that case, including among others, specific treaty or statutory provisions. Secretary Ickes, in his foreword to Cohen's *Handbook of Federal Indian Law,* speaks of "the complexity of the body of Indian law, based upon more than 4,000 treaties and statutes and upon thousands of judicial decisions and administrative rulings, rendered during a century and a half."[6] Obviously, separate treaties and agreements with separate tribes must be separately construed.

■ It is clear from the reported cases that, despite numerous differences in specific fact situations, the overriding judicial inquiry remains unchanged, namely, the congressional intent. Thus in *Seymour v. Superintendent,* 368 U.S. 351, 356, 82 S.Ct. 424, 427, 7 L.Ed.2d 346 (1961), in holding that the 1906 Act of Congress there involved did not extinguish the Colville Indian Reservation, the Court relied repeatedly on materials from which it "seem[ed] clear that the purpose of the 1906 Act was neither to destroy the existence of the diminished Colville Indian Reservation nor to lessen federal responsibility for and jurisdiction over the Indians having tribal rights on that reservation." *Mattz v. Arnett,* 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973) utilizes the same test for disestablishment, namely, "A congressional determination to terminate

---

5. That since the opening of such disputed area for homesteading, at the time hereinbefore set forth, for more than fifty years the white settlers and their successor in interest, people of Indian Descent, whether enrolled or not enrolled as members of the Rosebud Sioux Tribe, and the Plaintiff itself, until the commencement of this action, had considered such Congressional authorization to homestead, removed such disputed area from the boundaries of the Rosebud Sioux Indian Reservation, and returned such land to the United States of America, who, upon the granting of homestead rights and the issuance of a patent to such land to a white settler, relinquished exclusive jurisdiction over such patented land and authorized the same to become an integral part of the State of South Dakota and the United States of America.

That no white person would have settled within, homesteaded, and applied and accepted a patent to land in the disputed area, were he to believe, or were he told at the time of so acting that his patented land remained within the boundaries of the Rosebud Sioux Indian Reservation, under the control of the Congress of the United States, any of its authorized agents, and any authorized tribal council or other governing body of the Rosebud Sioux Tribe.

&ast; &ast; &ast; &ast; &ast; &ast;

As a result of such uniform and universal recognition that the disputed territory, settled by the whites, is a part of the State of South Dakota, and is excluded from the territorial boundaries of the Rosebud Sioux Indian Reservation, subsequent to homesteading and patenting, such disputed territory has been developed substantially through the energy, efforts, and moneys of such white settlers, their successors in interest, and the State of South Dakota and its political subdivisions, unaided by any effort of the Plaintiff.

Answer of Defendants Kneip and Mydland, 1 App. at 15–17.

6. Ickes, *Foreword* to F. Cohen, *Handbook of Federal Indian Law* v. (1942).

\* \* \* expressed on the face of the Act or \* \* \* clear from the surrounding circumstances and legislative history." We are aware of course, that much modern thinking respecting the culture and welfare of the Indians is at marked variance with that of the period we now survey, that around the turn of the century. But we do not sit to rewrite the legislation of decades past. We look to the congressional intent when it was written viewing the totality of the circumstances from the record in its entirety. The Tribe urges the lack of "express language extinguishing tribal title, or placing the land in the public domain, or altering the boundaries of the reservation." But here the Tribe misapprehends the applicable criteria.[7] Precise verbal formulae of extinguishment or alteration of boundaries, however apt or helpful, are not a *sine qua non* of disestablishment. We seek, as we said, the congressional intent, which may be variously expressed.

Our guidelines were most recently stated in *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092–93, 43 L.Ed.2d 300 (1975) wherein it was held:

This Court does not lightly conclude that an Indian reservation has been terminated. "[W]hen Congress has once established a reservation, all tracts included within it remain a part of the reservation until separated therefrom by Congress." *United States v. Celestine*, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195. The congressional intent must be clear, to overcome "the general rule that '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'" *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, at 174, 93 S.Ct. 1257, at 1263, 36 L.Ed.2d 129 quoting *Carpenter v. Shaw*, 280 U.S. 363, at 367, 50 S.Ct. 121, at 122, 74 L.Ed. 478. Accordingly, the Court requires that the "congressional determination to terminate . . . be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history."

---

**7.** The Tribe overlooks, as well, the language of cession in the 1904 Act:

> cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted, situated within the boundaries of Gregory County, South Dakota \* \* \*.

1904 Act § 1, 33 Stat. 256 (ratifying Article I of the 1901 Agreement). Such language could not be more "precisely suited" to relinquish all the Tribe's interest in the unallotted lands. *See DeCoteau v. District County Court*, 420 U.S. 425, 445, 95 S.Ct. 1082, 1093, 43 L.Ed.2d 300 (1975) (hereinafter *DeCoteau*).

However, reliance may not ordinarily be placed upon dispositive terminology alone. Where we consider, as here, attempted legislative adjustment of contesting social forces the answer will not be found in the dictionary. It is settled that legislation of the general nature here under consideration is sufficiently ambiguous with respect to the effect on the boundaries of a reservation that the result in a particular case will depend upon its own facts. *United States ex rel. Condon v. Erickson*, 478 F.2d 684, 689 (8th Cir. 1973); *see DeCoteau*, 420 U.S. at 444, 95 S.Ct. at 1093; *Mattz v. Arnett*, 412 U.S. 481, 505 & n. 23, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). Thus in *Con-*

*don, supra,* the court was not compelled to its conclusion, that the reservation's boundaries were not altered, by the superficial similarity of the legislation there at issue to those acts held not to have altered reservation boundaries in *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962) and *City of New Town v. United States*, 454 F.2d 121 (8th Cir. 1972). Despite the similarity in language, the court considered the matter a "close question" which it resolved against disestablishment only upon an analysis of the legislative history and surrounding circumstances that disclosed "[t]he Congressional intent underlying the 1908 Act with respect to the reservation's boundaries [to be] not clearly discernible \* \* \*." *Condon, supra*, 478 F.2d at 687, 688.

Cases where the congressional intent "was that the reservation should continue to exist as such," *Seymour, supra*, 368 U.S. p. 355, 82 S.Ct. p. 427, or *New Town, supra*, where the court was unable to find a congressional intent to disestablish are not, of course, inconsistent with the result we have reached. For (as will be fully developed herein), the defendants before us have demonstrated that a congressional determination to terminate lay behind each of the Acts in question.

*Mattz v. Arnett,* 412 U.S., at 505, 93 S.Ct. at 2258. See also *Seymour v. Superintendent,* 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, and *United States v. Nice,* 241 U.S. 591, 36 S.Ct. 696, 60 L.Ed. 1192. In particular, we have stressed that reservation status may survive the mere opening of a reservation to settlement, even when the moneys paid for the land by the settlers are placed in trust by the Government for the Indian's benefit. *Mattz v. Arnett, supra,* and *Seymour v. Superintendent, supra.*

■ It is clear from *DeCoteau* that our inquiry may encompass all materials reasonably pertinent to the legislation,[8] including the debates thereon and official correspondence with respect thereto, and administrative treatment of the area;[9] as well as those bearing upon the historical context of its passage, such as the social forces then at work in the area and particularly the demands of our westward moving society arrayed against the contesting demands of the Indians for their culture and support.[10]

The original Rosebud Reservation was an area of great extent. Subsequent to its delineation, however, the "familiar forces" above noted came into operation.

Gregory County, in particular, "had been anxious to acquire that portion of the Rosebud Reservation within its boundaries, ostensibly because the county government could not be maintained by the number of settlers on the small amount of non-reservation land available within it. After nearly two years, the county obtained the assistance of the very able congressional delegation from South Dakota, and under their direction the processes of acquisition were set in motion."[11]

Opposed to such acquisition, however, stood not only the reservation area as fixed under the 1889 Act but, indeed, the way of life of the Sioux:

Over a vast tract of country the Teton Sioux ranged in historical times. The territory of Dakota, to which he gave the name of his nation, Dakota, —friends,—was his pasture and his hunting-ground, and he has been far removed from his allies and relatives, the Santees of the eastern bands, for many years. By the right of might and preëmption, the Sioux had a kingdom for his back yard and an empire for his pasture. For hundreds of miles he had a free hand, and knew no bound when he rode west through the buffalo grounds on the far side of the

---

**8.** The Tribe has submitted, with the court's permission, the maps contained in the Annual Reports of the Commissioner of Indian Affairs for the years 1904–1912. We find these materials inconclusive and unpersuasive as to congressional intent. From 1904 to 1908 none of Gregory County was designated "Indian Reservation" on said maps. From 1909 to 1917 Tripp County and the portions of Gregory and Lyman Counties within the original reservation, and from 1912 to 1917 Mellette County, were designated "Opened" reservation. After 1918 all the disputed areas were designated "Former Indian Reservation." *Cf. DeCoteau,* 420 U.S. at 442, 95 S.Ct. at 1092 n. 27.

**9.** *E.g.,* Letter from the Field Solicitor, Aberdeen, South Dakota, to the Director of the Aberdeen Area Office, Bureau of Indian Affairs, April 6, 1972, at 6, 4 App. at 478 expressing the opinion that "the legal boundaries of the Rosebud Indian Reservation have not

been diminished or altered by Congress since the establishment of the original boundaries thereof * * *."

**10.** *See DeCoteau,* 420 U.S. at 431, 95 S.Ct. at 1086: "But familiar forces soon began to work upon the [Indian reservation there under examination]. A nearby and growing population of white farmers, merchants, and railroad men began urging authorities in Washington to open the Reservation to general settlement." The Supreme Court there quotes a letter of banker Diggs to the Secretary of the Interior asserting the presence of the reservation to be "a great detriment to our interest, as it blocks the progress of two or three lines of railroad that we are very anxious to see completed." *Id.* 420 U.S. at 431, 95 S.Ct. at 1086 n. 8.

**11.** Comment, *New Town Et Al.: The Future of an Illusion,* 18 S.D.L.Rev. 85, 88 (1973) (Footnote omitted).

Missouri, until he stopped to reconnoitre the country of the Crows on the west, and the home of the Piegans, Bloods, and Blackfeet to the northwest.[12]

Obviously adjustments between these competing forces had to be made. It was Inspector McLaughlin who was assigned the first step in the desired acquisition of Gregory County, that of reaching agreement with the Sioux. He describes his mission, and its attainment, in the following terms:

Three years later [in 1901] I went to these same Indians with a proposition involving an agreement for the cession of a great body of land that was required for settlement by the whites. The land lay in Gregory County, South Dakota, and there were about four hundred and sixteen thousand acres in the tract. The deal was a big one, and there were many big talks. The Indian had come to a proper appreciation of the value of his holdings, and the government had not yet taken the position that there should be no appropriation for the purchase of the lands needed, that the government would only take over the lands and dispose of them to settlers, holding the funds in trust for the Indians, but guaranteeing nothing, except that there would be a fixed price per acre charged to the settlers. The Rosebuds did not like the deal, and it was a case where I had to use personal influence to bring the agreement about. The people of South Dakota were very anxious to open the lands, and the rush to Bonesteel and the surrounding country resulting from this cession is still remembered. I talked to the chiefs and head men. I was well known to them, and they had confidence that I would not do anything that was opposed to

their interest. But they were not easily moved. I made the agreement finally, securing the signatures to it September 14. The amount of money to be received by the Indians, under the terms of the sale, was $1,040,000.[13]

The Rosebud Reservation was one of the smaller reservations[14] which had been carved out of the Great Sioux Reservation by the Act of March 2, 1889.[15] Section 12 of this Act provides:

Sec. 12. That at any time after lands have been allotted to all the Indians of any tribe as herein provided, or sooner, if in the opinion of the President it shall be for the best interests of said tribe, it shall be lawful for the Secretary of the Interior to negotiate with such Indian tribe for the purchase and release by said tribe, in conformity with the treaty or statute under which such reservation is held of such portions of its reservation not allotted as such tribe shall, from time to time, consent to sell, on such terms and conditions as shall be considered just and equitable between the United States and said tribe of Indians, which purchase shall not be complete until ratified by Congress: *Provided, however,* That all lands adapted to agriculture, with or without irrigation, so sold or released to the United States by any Indian tribe shall be held by the United States for the sole purpose of securing homes to actual settlers, and shall be disposed of by the United States to actual and bona-fide settlers only in tracts not exceeding one hundred and sixty acres to any one person, on such terms as Congress shall prescribe, subject to grants which Congress may make in aid of education * * *.

25 Stat. 892.

12. J. McLaughlin, *My Friend the Indian* 263–64 (1910). The author, James McLaughlin, was United States Indian Inspector for the Department of the Interior, serving in such capacity for many years. He is the Inspector McLaughlin who is referred to in the briefs before us and who will be quoted by us hereinafter.

13. *Id.* at 309.

14. Another of these was the Pine Ridge Reservation, the boundaries of which were held, in *United States ex rel. Cook v. Parkinson,* 396 F.Supp. 473 (D.S.D.1975) to have been diminished by the Act of May 27, 1910, ch. 257, 36 Stat. 440, removing Bennett County therefrom.

15. Act of March 2, 1889, ch. 405, 25 Stat. 888, often referred to in the literature as the "General Crooks" or the "Crooks" treaty.

Inspector McLaughlin, in early 1901, proceeded to the Reservation to undertake negotiations with the Indians. As he explained it to them on September 5, 1901:

I am here under orders of the Secretary of the Interior, who was authorized by Congress, at its last session, to negotiate, through any Indian inspector, with any Indian tribes for the cession of their surplus lands, and he has sent me here to negotiate with you for your surplus lands in Gregory County, that is, for all of your lands in Gregory County that have not been allotted to Indians. * * *

* * * * * *

*The cession of Gregory County will leave your reservation a compact, and almost square tract, and would leave your reservation about the size and area of Pine Ridge reservation.*[16]

Similar representations were made to other groups of Indians. Thus on April 13 to the Ponca Creek District of the Rosebud Reservation:

My friends, I have called to see you to-day for the purpose of ascertaining whether or not you are willing to sell the unallotted lands in Gregory County to the Government. * * * You doubtless know that there has been considerable talk for the past two years of negotiating with you people *for this corner of the reservation.* * * *

* * * * * *

In negotiating with Indians for tracts of land, a portion of which has been allotted to them, the privilege has been given the Indians to elect whether they shall remain upon their

allotments or *relinquish their allotments and remove to the reservation.* I do not think that it is for the best interest of the Indians at any time to vacate their allotments. The lands that you have taken are, of course, the best lands of this county, and it is very doubtful if you could find as good land anywhere within the *diminished reservation* for the reason that the best lands have all been allotted.

* * * * * *

* * * *If you dispose of this surplus land it will leave you about the same sized reservation as the Pine Ridge Indians have.* * * *

* * * * * *

* * * *By disposing of this little corner of the reservation, it would leave you a nice, square reservation,* and the proceeds of the sale would benefit you very much.[17]

Likewise to the Indians of the Big White River District on April 15, 1901:

Every person would have the privilege of remaining on the land that has been allotted to him, *or of relinquishing it and removing to the diminished reservation,* but I would advise you who have selected tracts of land to remain upon your allotments in case of the cession of this land to the Government.[18]

Response, in part, was made by Ralph Eagle Feather in the following terms:

We Indians intend to own the land, and have taken it in allotments, just as the President said to take it. We want payment for all vacant land left after that. After that the Indians of future generations can live upon the land and own it—that is, the lands

---

**16.** *Proceedings of a Council with the Indians of Rosebud Reservation, September 5, 1901,* in S.Doc.No.31, 57th Cong., 1st Sess. 12 (1901), 2 App. at 18 (Emphasis added).

**17.** *Proceedings of a Council with the Indians of the Ponca Creek District, Rosebud Reservation, April 13, 1901,* in S.Doc.No.31, 57th

Cong., 1st Sess. 8–10 (1901), 2 App. at 16–17 (Emphasis added).

**18.** *Proceedings of a Council with the Indians of the Big White River District, Rosebud Reservation, April 15, 1901,* in S.Doc.No.31, 57th Cong., 1st Sess. 11 (1901), 2 App. at 17 (Emphasis added).

within the *diminished reservation,* in case Gregory County should be ceded.[19]

Upon such representations and with such understandings, agreement was reached, on September 14, 1901, with the required three-fourths adult male Indians.[20] The agreement provided in substance for a cession of unallotted land within Gregory County in return for a lump-sum payment by the Government.[21]

The language employed, "cede, surrender, grant and convey" leaves no doubt as to its meaning. There is a complete relinquishment of right, title, and claim. "It would be impossible," we have held of the words "ceded, conveyed, transferred, relinquished and surrendered," "to select words operating more completely to extinguish every vestige of Indian title, and releasing the government more absolutely from every obligation, moral as well as legal."[22] So here. In fact the Tribe concedes that had the Congress adopted a bill simply ratifying the Agreement, "Indian title to the 'surplus' land would have been extinguished."

The negotiated Agreement, however, was never ratified.[23] The problem in the Congress was not jurisdiction, title, or boundaries. It was, simply put, money. The problem was first put thus by Senator Platt, who proposed to abandon the "free-homes" policy:

---

**19.** *Proceedings of a Council with the Indians of Rosebud Reservation, September 5, 1901,* in S.Doc.No.31, 57th Cong., 1st Sess. 21 (1901), 2 App. at 22 (Emphasis added).

**20.** The Treaty with Different Tribes of Sioux Indians, April 29 *et seq.,* 1868, 15 Stat. 635, which established the Great Sioux Reservation, required, for cession of any portion of the reservation, execution and signature by at least three-fourths of all the adult male Indians occupying or interested in the same. *Id.,* Art. XII, 15 Stat. 639.

**21.** This agreement made and entered into on the fourteenth day of September, nineteen hundred and one, by and between James McLaughlin, United States Indian inspector, on the part of the United States, and the Sioux tribe of Indians belonging on the Rosebud Reservation, in the State of South Dakota, witnesseth:

ARTICLE I. The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted, situated within the boundaries of Gregory County, South Dakota, described more particularly as follows: * * *.

ARTICLE II. In consideration of the land ceded, relinquished, and conveyed by Article I of this agreement the United States stipulates and agrees to expend for and pay to said Indians, in the manner hereinafter provided, the sum of one million and forty thousand (1,040,000) dollars.

* * * * * *

ARTICLE V. It is understood that nothing in this agreement shall be construed to deprive the said Indians of the Rosebud Reservation, South Dakota, of any benefits to which they are entitled under existing treaties or agreements, not inconsistent with the provisions of this agreement.

ARTICLE VI. This agreement shall take effect and be in force when signed by U. S. Indian Inspector James McLaughlin and by three-fourths of the male adult Indians parties hereto, and when accepted and ratified by the Congress of the United States.

* * * * * *

The full text of the 1901 Agreement appears in the preamble to the 1904 Act, 33 Stat. 254–55.

We do not take the word "benefits" in Article V to have a fixed meaning applicable to all its uses. Here the original Agreement which the Tribe concedes would have "extinguished" Indian title had it been ratified, as well as the 1904 Act itself, provided that the Agreement should not deprive the Rosebud Indians of any "benefits to which they are entitled under existing treaties or agreements, not inconsistent with the provisions of this agreement." Since one of the "provisions of this agreement" was the cession of Gregory County, we cannot accept the Tribe's argument that consistently with the agreement it nevertheless remained entitled to a fixed boundary including Gregory County.

**22.** *United States v. Myers,* 206 F. 387, 392 (8th Cir., 1913); See note 7 *supra.*

**23.** In 1902 a ratification bill passed the Senate and was reported favorably in the House. 35 Cong.Rec. 5024 (1902) (S. 2992 passes Senate); H.R.Rep.No.2099, 57th Cong., 1st Sess. (1902) (to accompany S. 2992). Because of the problem discussed below, the bill was never given consideration on the floor of the House. *See* text accompanying note 25, *infra.*

\* \* \* It is true that several years ago—more than ten years ago, I think—in opening Indian reservations, we paid large and extravagant prices for land to the Indians, upon the theory that the Government was going to be reimbursed for its expenditures by the settlers paying for the land which they settled upon a sufficient sum to reimburse the Government. That went on for years, and everybody supposed that that was acceptable to the settlers. Then the settlers began to agitate that the Government should remit to them the obligation which they had incurred to pay for the land, and thereby reimburse the Government; and the history of that agitation of course is well known. The Government remitted about $35,000,-000 which it had paid to the Indians and which the settlers had agreed to repay to the Government by the passage of that free-homes bill.

35 Cong.Rec. 3188 (1902).

Further discussion in the same vein is found in 35 Cong.Rec. 4801–02 (1902):

[Mr. PLATT.] This is a bill for the opening of the Rosebud Reservation in South Dakota. I do not remember at this time the exact number of acres which are thus to be opened by the bill, but the price to be paid to the Indians is something over a million dollars. *The question is whether the Government, in opening the lands to settlement, shall give the lands thus purchased from the Indians to the settlers under the homestead law, or whether it shall require the settlers who take up these lands under the homestead law to pay for them a sum per acre equivalent to what the Government pays the Indians for them.* In other words, in opening the Indian reservations which already remain, what is to be the policy of the Government? Are we to pay the Indians a high price for the lands which we obtain a cession of, and then give those lands to settlers free of cost, or shall we require the settlers to pay as much for the lands as will make up

wholly for the amount which we have paid for them? That is the question, and Senators will see that it is a far-reaching question. [Emphasis added.]

\* \* \* \* \* \*

Now, the pressure for the opening of this land is great. I do not think anyone who does not live in the vicinity of those reservations understands how great it is. \* \* \*

\* \* \* \* \* \*

Now, this particular agreement comes here to be ratified upon a payment to the Indians of about $2.50 an acre for the surplus lands within their reservation which are under the agreement to be ceded to the United States and become a part of the public domain. The Indians in negotiating said that was not a fair price for the lands and they were worth a great deal more, but finally the negotiation was concluded. The agreement comes here. So far as the Senate considers it, it is an agreement to open a reservation—to pass ordinarily without any particular examination or any thought of the consequences to the Government in the matter of expense. I will not go into the history of the negotiations as to these lands, but the price paid or agreed to be paid to the Indians is $2.50 an acre for the entire acreage which is to be brought under the public domain by cession to the United States.

The bill proposes that the land thus acquired shall be open to homestead settlement without requiring any payment for the land settled upon from the settler. My amendment proposes that the settler shall pay $2.50 an acre, being the same which the Government has agreed to pay to the Indians, and that thus the Government shall be reimbursed for the amount expended for the purchase.

Senator Clapp opposed the Platt amendment, stating in part:

Here is this reservation in South Dakota. Of course the Senators from South Dakota can speak more specifi-

cally of the character of the reservation and its surroundings than I can; but because we have to pay the Indians a certain amount for that reservation, as a matter of progressive Indian policy, for the purpose of separating the Indians and extinguishing the reservation or for the purpose of meeting the advancing demands of civilization for the use of the lands, it does not follow that the land is primarily and inherently worth so much an acre [to settlers].

35 Cong.Rec. 4807 (1902).

Although the Platt amendment was defeated in the Senate,[24] the ratification bill languished in the House "because of the fact that it provided that the Government should pay for the lands outright." [25] New bills were introduced and reported from committee in both chambers which proposed "to adopt a new policy in acquiring lands from the Indians [by] providing that the lands shall be disposed of to settlers * * *, and to be paid for by the settlers, and the money to be paid to the Indians only as it is received * * * from the settlers." [26] The Senate bill passed, but the 57th Congress expired before the House could give it consideration.[27]

Thereafter, in June 1903, Inspector McLaughlin was instructed to return to the reservation to negotiate a new agreement in light of the "new departure" proposed by the latest Senate bill.[28] He explained the changes to the Tribe in the following terms:

My friends, I am very glad to meet you today. I have been sent here by the Secretary of the Interior to present to you a modification of the agreement we entered into two years

---

24. 35 Cong.Rec. 4971 (1902).

25. 38 Cong.Rec. 1423 (1904) (remarks of Congressman Burke). See S.Rep.No.3271, 57th Cong., 2d Sess. 2 (1903); 36 Cong.Rec. 2748 (1903) (remarks of Senator Gamble).

26. H.R.Rep.No.3839, 57th Cong., 2d Sess. 1–2 (1903) (to accompany H.R. 17467); S.Rep.No. 3271, 57th Cong., 2d Sess. 2 (1903) (to accompany S. 7390) (quoting House Report).

27. 36 Cong.Rec. 2748 (1903) (S. 7390 passes Senate).

28. Letter from the Commissioner of Indian Affairs to James McLaughlin, U.S. Indian Inspector, June 30, 1903, at 1–2, 5, 7, 2 App. at 62–63, 66, 68:

In a joint request to the Department dated April 4, 1903, the members of the South Dakota delegation in Congress, Senators Gamble and Kittredge and Representatives Burke and Martin, asked that an Inspector be detailed to proceed to the Rosebud Indian reservation, in South Dakota, for the purpose of negotiating a new agreement with the Indians thereof for the cession of the unallotted portion of their reserve embraced in Gregory County, along the lines proposed in Senate Bill No. 7390, 57th Congress. * *

The essential features of said S. 7390, with which you are already familiar, are as follows:

(1) That instead of paying the Indians the lump sum of $1,040,000 for the surplus Gregory County lands as provided in the

agreement of September 14, 1901, the lands be disposed of to settlers under the provisions of the homestead and town-site laws, excepting sections 16 and 36 or the equivalent thereof, at not less than $2.50 per acre, the proceeds arising from such sale to be paid to the Indians.

* * * * * *

* * * the method proposed for disposing of these lands is a new departure, and it is therefore specially desirable that the matter should be thoroughly understood by the Indians before they enter into an agreement along the lines proposed * * *.

* * * * * *

It is not deemed necessary herein to give you any definite instructions as to the form of the agreement and the manner of its execution inasmuch as you are thoroughly familiar with these features of the subject. Attention is invited in this connection, however, to Departmental instructions to you dated March 21, 1901, in connection with the negotiation of the former agreement.

The names of Charles H. Burke and Robert J. Gamble appear frequently in the documentation of the period. Mr. Burke was Congressman from South Dakota for many years, later serving as Commissioner of Indian Affairs. Mr. Gamble was Senator from South Dakota from 1900 to 1912. Comment, *New Town Et Al.: The Future of An Illusion*, 18 S.D.L.Rev. 85, 88 n. 9 (1973).

ago for your unallotted Gregory County lands.[29]

There has been a sentiment growing in Congress for a number of years past, and is now stronger than ever, against paying Indians for ceded lands direct from the U.S. Treasury. This is what is referred to in my letter of instructions, which I read you, as being a new departure in the manner of disposing of the surplus lands of Indian reservations, and instead of paying Indians direct from the U.S. Treasury as heretofore for their surplus lands; they will be paid from the proceeds of the sale of lands ceded; the Department thus acting as trustee for the Indians, and the Interior Department having charge of the lands will dispose of them in such a manner as will secure to the Indians the highest price obtainable. This is the new departure referred to, and I believe, my friends, that no treaty will ever again be made with Indians, by which they will receive a lump sum consideration for the tract ceded, but only what the Government is able to realize from the sale of the lands.[30]

* * * I am here to try to enter into a new agreement, from which you will receive as for your lands as the agreement of two years ago provided, but the manner of disposing of it is different. * * *

* * * * * *

* * * The Government collects from the homesteader and pays it over to you.[31]

* * * *I am here to enter into an agreement which is similar to that of two years ago, except as to the manner of payment * * *. You will still have as large a reservation as Pine Ridge after this is cut off.*[32]

* * * The agreement which I submit for your consideration is similar in every respect to that of two years ago, except you will have to wait for the sale of the land to receive your money * * *.[33]

* * * The [congressional] objections to the former agreement was not on account of the price, but to the manner of payment.[34]

Inspector McLaughlin succeeded in obtaining a majority (though not three-fourths) consent to the new method of payment, provided that the price to homesteaders be raised from $2.50 to $2.75 per acre.[35] Within nine months Congress passed a ratification bill which amended the 1901 Agreement solely with respect to the method of payment.[36] As a substitute for the lump-sum payment by the United States,[37] the 1904 Act provided that the Government would receive funds from the settlers as trustee for the Indians.[38] Homesteaders were to

---

29. *Minutes of Council held at Rosebud Agency, S.D. with the Sioux Indians belonging on the Rosebud Reservation* at 1, 2 App. at 70 (July 24, 1903).

30. *Id.* at 5, 2 App. at 74 (July 25, 1903).

31. *Id.* at 12, 2 App. at 81 (July 29, 1903).

32. *Id.* at 21–22, 2 App. at 90–91 (July 30, 1903) (Emphasis added).

33. *Id.* at 37, 2 App. at 106 (August 8, 1903).

34. *Id.* at 50, 2 App. at 119 (August 10, 1903).

35. Agreement of August 10, 1903, 2 App. at 120–26.

36. Act of April 23, 1904, ch. 1484, 33 Stat. 254.

37. 1901 Agreement, Art. II, *supra* note 21.

38. Article II of the 1901 Agreement was amended to read as follows:

"ART. II. In consideration of the land ceded, relinquished, and conveyed by article one of this agreement, the United States stipulates and agrees to dispose of the same to settlers under the provisions of the homestead and town-site laws, except sections sixteen and thirty-six, or an equivalent of two sections in each township, and to pay to said Indians the proceeds derived from the sale of said lands; and also the United States stipulates and agrees to pay for sections sixteen and thirty-six, or an equivalent of two sections in each township, two dollars and fifty cents per acre."
1904 Act § 1, 33 Stat. 256.

Section 6 of the 1904 Act provides:

That nothing in this Act contained shall in any manner bind the United States to pur-

pay substantially higher prices than those provided in the 1903 Agreement,[39] to insure that the Indians would receive as much under the new method as provided in the 1901 Agreement.[40]

■ The Tribe stresses to us the lack of a three-fourths majority Indian consent to the 1904 Act (as well as the 1907 and 1910 Acts), referring at times to "unilateral" actions by the Congress. It should be noted, in this regard, however, that in January, 1903 the Supreme Court decided *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). The case concerned the validity of a cession of tribal lands enacted in contravention of a treaty requiring three-fourths Indian consent. The Court held:

The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy,

particularly if consistent with perfect good faith towards the Indians. * *

* * * * * *

* * * In any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress, and not to the courts. The legislation in question was constitutional, and the demurrer to the bill was therefore rightly sustained.

187 U.S. at 566, 568, 23 S.Ct. at 221, 222 (Emphasis in original).

The effects of this decision, we note, were explained to the Indians by Inspector McLaughlin in 1903, 1906, and 1909.[41] Consequently, it was clear that the vote of three-fourths of the adult male Indian population was no longer required as consent to cession of any portion of the Rosebud Reservation.[42]

■ The 1904 Act, incorporating the entire text of the 1901 Agreement (save for the lump-sum provision) passed under the circumstances detailed in part heretofore, was obviously an outgrowth of and a continuation of the objectives

---

chase any portion of the land herein described, except sections sixteen and thirty-six or the equivalent in each township, or to dispose of said land except as provided herein; or to guarantee to find purchasers for said lands, or any portion thereof, it being the intention of this Act that the United States shall act as trustee for said Indians to dispose of said lands and to expend and pay over the proceeds received from the sale thereof only as received, as herein provided. 33 Stat. 258.

These provisions are substantially identical to terms contained in the 1903 Agreement. Agreement of August 10, 1903, Arts. II, VI, 2 App. at 120–21, 23.

**39.** Four dollars per acre for lands entered within the first three months, three dollars per acre for lands entered during the second three

months, and two dollars and fifty cents per acre for lands entered thereafter. 1904 Act § 2, 33 Stat. 257–58.

**40.** *See* 38 Cong.Rec. 1423 (1904) (remarks of Congressman Burke).

**41.** *Minutes of a Council held at Rosebud Agency, S.D. with the Sioux Indians belonging on the Rosebud Reservation* at 5–6, 2 App. at 74–75 (July 25, 1903); at 11, 2 App. at 80 (July 29, 1903); at 23–24, 2 App. at 92–93 (July 30, 1903). *Proceedings of a Council held at Rosebud Agency, S.D. with the Indians of the Rosebud Reservation, December 14, 1906* at 10, 35, 3 App. at 185, 210. *Proceedings of a Council held with the Indians of the Rosebud Agency, April 21, 1909* at 4, 13, 15–16, 3 App. at 304, 313, 315–16.

**42.** See note 20 *supra*.

of the 1901 Agreement. The terminology employed, language of diminution and extinguishment, was used interchangeably with respect both to the proposed ratification of the 1901 Agreement and the passage of the 1904 Act.[43] Nowhere do we find, in the legislative history or materials from the period, any indication in substantial support of the claim now made by the Tribe that the exterior boundaries of the Reservation were to be left undisturbed despite the cession of the County of Gregory. The point at issue was method of payment for the land. Such was the subject of the extended discussion and debate. As for the reservation land itself, Gregory County was to be thrown open to settlers, and the reservation *pro tanto* extinguished. It is significant that from the inception of the negotiations preceding the original agreement reached, through those undertaken by Inspector McLaughlin upon his return with the proposed amendment, the parties were negotiating in terms that left no doubt that actual diminution was involved. The above-quoted language, "[y]ou will still have as large a reservation as Pine Ridge after this is cut off," "negotiating with you [Indians] for this corner of the reservation," "relinquish their allotments and remove to the reservation," "the diminished reservation," "leave you a nice, square reservation" "removing to the diminished reservation," "disposing of this little corner of the reservation" and "leave your reservation a compact, and almost square tract * * * about the size and area of the Pine Ridge reservation," admits of no other conclusion.

Whatever question there may be as to the proper interpretation of "diminished," that is, whether it means diminution by the carving out of a described area with concomitant change of boundaries, or a diminution by sale of lots to non-Indians without changing the boundaries,[44] upon the facts before us it is clear that the parties contemplated a carving out process. Such descriptions of the effect of the negotiations, found in both pre-agreement and post-agreement materials as we have cited above, are persuasive as to intent. We observe, moreover, in this regard, the Supreme Court's recent and like employment of the term "diminished reservation" as involving a necessary and corresponding adjustment of reservation boundaries in a carving-out situation:

It is true that the Sisseton-Wahpeton Agreement was unique in providing for cession of all, rather than simply a major portion of the affected Tribe's unallotted lands. But as the historical circumstances make clear, this was not because the Tribe wished to retain its former Reservation, undiminished, but rather because the Tribe and the Government were satisfied that retention of allotments would provide an adequate fulcrum for Tribal affairs. In such a situation, exclusive tribal and federal jurisdiction is limited to the retained allotments. 18 U.S.C. § 1151(c). See *United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676. With the benefit of hindsight, it may be argued that the Tribe and the Government would have been better advised to have carved out a diminished reservation, instead of or in addition to the retained allotments. But we cannot rewrite the 1889 Agreement and the 1891 statute.

*DeCoteau, supra,* 420 U.S. at 446, 95 S.Ct. at 1094.

The Court's suggestion that the parties "would have been better advised to have carved out a diminished reservation, instead of or in addition to the retained allotments" is particularly appropriate to the facts before us in view of the 1904

---

**43.** *See* 35 Cong.Rec. 4807 (1902) (remarks of Senator Clapp) *supra* at 95; H.R.Rep.No.443, 58th Cong., 2d Sess. 3 (1904) and S.Rep.No. 651, 58th Cong., 2d Sess. 3 (1904) (quoting House Report) *infra,* at 102.

**44.** *United States ex rel. Condon v. Erickson,* 478 F.2d 684, 687 (8th Cir. 1973).

Act under which, from the Tribe's original reservation, "all that part of the Rosebud Indian Reservation now remaining unallotted, situated within the boundaries of Gregory County" was ceded, granted and conveyed to the United States,[45] clearly thus having "carved out a diminished reservation," leaving the Tribe with an "almost square tract," with necessarily altered boundaries.

The school lands provision of the 1904 Act is also relied upon by the defendants as showing congressional intent to disestablish Gregory County. The argument, applicable as well to the 1907 and 1910 Acts, *infra*, stems from the provisions of the Act of February 22, 1889, ch. 180, 25 Stat. 676, admitting the Dakotas into the Union. In pertinent part the Act provides as follows:

> An act to provide for the division of Dakota into two States and to enable the people of North Dakota, South Dakota, Montana, and Washington to form constitutions and State governments and to be admitted into the Union on an equal footing with the original States, *and to make donations of public lands to such States.*
>
> \* \* \* \* \* \*
>
> SEC. 10. That upon the admission of each of said States into the Union sections numbered sixteen and thirty-six in every township of said proposed States \* \* \* are hereby granted to said States for the support of common schools, \* \* \*: Provided, That the sixteenth and thirty-sixth sections embraced in permanent reservations for national purposes shall not, at any time, be subject to the grants \* \* \* of this act, *nor shall any lands embraced in Indian,* military, or other *reservations* of any character *be subject to the grants* \* \* \* of this act *until the reservation shall have been extinguished* and such lands be restored to, and become a part of, the public domain.

25 Stat. 676, 679 (Emphasis added).

Section 4 of the 1904 Act provides in part:

> That sections sixteen and thirty-six of the lands hereby acquired in each township shall not be subject to entry, but shall be reserved for the use of the common schools and paid for by the United States at two dollars and fifty cents per acre, and the same are hereby granted to the State of South Dakota for such purpose \* \* \*.

33 Stat. 258. The provision may be traced to a Senate committee amendment to the original ratification bill.[46] As Senator Gamble explained the amendment:

> Under the provisions of the enabling act authorizing the admission of the State of South Dakota into the Union, sections 16 and 36 in every township were reserved for school purposes. This provision did not apply to permanent Indian reservations, but became operative when the Indian title was extinguished and the lands restored to and became a part of the public domain. This would withdraw about 29,000 acres of these lands and would leave 387,000 acres to be opened to settlement, and which would be affected by the proposed amendment.

35 Cong.Rec. 3187 (1902).

Similarly, in a colloquy between Congressman Finley and Congressman Burke, like explanation was made:

> Mr. FINLEY. Mr. Speaker, I observe that in section 4, reserving school lands, it is provided that the Government pay for those lands. Is that the usual appropriation that is put in all bills of this character?
>
> Mr. BURKE. I am glad that the gentleman has asked me that question. I would state that under the enabling act under which the State of South Dakota was admitted to the Union it was provided that sections 16 and 36 in said State should be reserved for

---

**45.** 1904 Act § 1, 33 Stat. 256 (ratifying Article I of the 1901 Agreement).

**46.** S.Rep.No.662, 57th Cong., 1st Sess. 1 (1902).

the use of the common schools of that State, and it further provided that as to the lands within an Indian reservation the provisions of that grant would not become operative until the reservation was extinguished and the land restored to the public domain. That enabling act was passed by Congress on the 22d day of February, 1889. In March of that same year Congress ratified a treaty with the Sioux Indians in South Dakota for the cession of something like ten or eleven millions of acres of land, and made an express appropriation, in accordance with provisions of the enabling act, to pay outright of the Treasury the money for sections 16 and 36 of that land at the price stipulated for in the treaty.

38 Cong.Rec. 1423 (1904). Further explanations of similar tenor will be found in both House and Senate reports.[47]

In the light of the above there can be no reasonable doubt that it was the congressional intent to extinguish the reservation in Gregory County. The Tribe argues that the school lands grant in the South Dakota enabling act would operate automatically upon the extinguishment of a reservation and that since Congress thought it necessary in the 1904 Act to grant school lands to South Dakota, the reservation must not have been extinguished. But we cannot ignore the legislative history outlined above from which it is clear that Congress included the provision to implement the grant in the enabling act and for no other reason. Thus the action of Congress in passing section 4 of the 1904 Act was premised solely upon an understanding that the reservation would be extinguished, and is persuasive that such is the effect of the Act.[48]

The argument of the Tribe that under the 1904 Act, as well as the 1907 and 1910 Acts, the Indian title to the lands "was not extinguished" rests in part upon the theory that under such Acts "the United States acted as trustee to dispose of the land and credit the proceeds to the Tribe." Thus, it is argued, Tribal title to the land was not extinguished, the Rosebud Reservation was not reduced by the said Acts, and the boundaries thereof were not altered.

The argument made will not withstand analysis in the light of the realities of the situation confronting the Congress at the time. The land was needed for settlement. The problem, as we have noted, involved payment therefor. It could be paid from the Treasury in a lump-sum as in *DeCoteau, supra*, where, after some per capita distribution, the balance was placed in trust,[49] or it could be placed in trust as received from the settler-purchasers, as here.[50] Judge Bogue, in the *Cook* case, employs the apt terminology of "certain-sum-in-trust" method as opposed to "uncertain-sum-in-trust."[51] Obviously, the Indians retain certain beneficial rights in both cases. If authority is needed therefor it is sup-

---

47. H.R.Rep.No.443, 58th Cong., 2d Sess. 2 (1904); S.Rep.No.651, 58th Cong., 2d Sess. 2 (1904). *See* S.Rep.No.3271, 57th Cong., 2d Sess. 2 (1903); H.R.Rep.No.3839, 57th Cong., 2d Sess. 2 (1903); S.Rep.No.662, 57th Cong., 1st Sess. 1, 2 (1902).

48. Nothing said in *DeCoteau* relative to school lands suggests a contrary conclusion. *See DeCoteau*, 420 U.S. at 445–46, 95 S.Ct. at 1093–94 n. 33.

49. As passed by the Congress, the 1891 Act recited and ratified the 1889 Agreement with the Tribe and appropriated $2,203,000 to pay the Tribe for the ceded land and to make good the Tribe's "loyal scout" claim. § 27,

26 Stat. 1038. A portion of the moneys was made available for immediate distribution to Tribal members, on a per capita basis, and the remaining funds were, as had been agreed, "placed in the Treasury of the United States, to the credit of said . . . Indians [at five percent interest] . . . for the education and civilization of said bands of Indians or members thereof." § 27, 26 Stat. 1039.

*DeCoteau*, 420 U.S. at 441, 95 S.Ct. at 1091.

50. 1904 Act § 1, 33 Stat. 256–57 (amending Article III of the 1901 Agreement).

51. *United States ex rel. Cook v. Parkinson*, 396 F.Supp. 473 (D.S.D.1975).

plied by the *Ash Sheep* case.[52] But the fact that a beneficial interest is retained does not erode the scope and effect of the cession made, or preserve to the reservation its original size, shape, and boundaries. The determination of disestablishment as we stated at the outset, rests upon congressional intent, as to which the method of payment, whether lump-sum or otherwise, is but one of many factors to be considered. Thus it was that the trust involved in *DeCoteau* had no more conclusive effect than the one here under consideration.

It was our holding in *United States ex rel. Condon v. Erickson,* 478 F.2d 684, 687 (8th Cir. 1973), which we here reiterate, that the changed method of payment above described "was simply a new method utilized by a Congress that no longer favored purchasing Indian lands and providing them free of cost to settlers." What had happened was simply that the Congress was through with purchasing Indian lands at great cost and providing them free to settlers. Thereafter the settlers would have to pay their way. The purchase money would inure to the benefit of the Indians, of course, and be held in trust for them,

but the record is barren of any disclosed intention thereby to preserve intact the area of the original reservation and its boundaries. Such an intention is utterly foreign to the entire tenor of the contemporary materials before us. The land was being thrown open for farming. The settlers were emigrating in great numbers to the new land in the West, buying their farms and planting their crops. The Indian reservations were being eroded, not preserved. The final reports on the 1904 Act leave no doubt as to the congressional meaning and intent:

> There is no question but what the Indians have no use for the land that is proposed to be ceded by this bill; that the tract is only a very small portion of the Rosebud Reservation, and *is really only a corner of the reservation, which will be left compact and in a square tract* and a reservation about equal in size to the Pine Ridge Reservation, in South Dakota.[53]

Our conclusions with respect to Gregory County are further supported by subsequent developments which culminated in the passage of the 1907 and 1910 Acts, to a consideration of which we will now proceed.[54]

---

**52.** *Ash Sheep Co. v. United States,* 252 U.S. 159, 40 S.Ct. 241, 64 L.Ed. 507 (1920) involved the status of land on the Crow Reservation in Montana subsequent to a cession agreement made, but prior to the opening of the land for settlement or entry. The agreement, "in terms, 'ceded, granted and relinquished' to the United States all of their 'right, title and interest,' " under a trust relationship substantially identical to that in the instant case. 252 U.S. at 164, 165–66, 40 S.Ct. at 242. The Court held in part that under these facts:

> until sales should be made, any benefits which might be derived from the use of the lands would belong to the beneficiaries and not to the trustee, and that they did not become "public lands" in the sense of being subject to sale, or other disposition, under the General Land Laws. * * * They were subject to sale by the government, to be sure, but in the manner and for the purposes provided for in the special agreement with the Indians, which was embodied in the Act April 27, 1904 (33 Stat. 352), * * * Thus we conclude that the lands described in the bill were "Indian lands" when the

company pastured its sheep upon them * * *.

252 U.S. at 166, 40 S.Ct. at 243.

**53.** H.R.Rep.No.443, 58th Cong., 2d Sess. 3 (1904) (Emphasis added) and S.Rep.No.651, 58th Cong., 2d Sess. 3 (1904) (Emphasis added) (quoting House Report).

**54.** Congressional action with reference to Gregory County shortly after the passage of the 1904 Act also confirms the conclusions. By the Act of February 7, 1905, ch. 545, 33 Stat. 700 Congress granted settlers an extension of time in which to establish their residence upon the opened Gregory County lands. The title and the body of the Act contain the following language:

> lands which were *heretofore* a part of the Rosebud Indian Reservation within the limits of Gregory County, South Dakota.

33 Stat. 700 (Emphasis added). *See* S.Rep.No. 2760, 58th Cong., 3d Sess. 1 (1905); H.R.Rep. No.4198, 58th Cong., 3d Sess. 1 (1905); 39 Cong.Rec. 1578 (1905) (remarks of Senator Gamble).

The forces at work for the opening of the Indian lands were not made quiescent by the Gregory cession. By 1906 the pressures for the opening of additional Indian lands in South Dakota were again being felt in the Congress. Responsive thereto, in early December, 1906, Senator Gamble and Congressman Burke, both of South Dakota, introduced separate bills providing for the opening of Tripp County.[55] Inspector McLaughlin was once again instructed to "enter into negotiations with the Rosebud Indians for the cession of the surplus unalloted land in Tripp County, South Dakota." The instructions continued, "You are familiar with the situation there and for this reason it is not deemed necessary to give instructions in detail for conducting the negotiations. * * * The following would seem to be fair terms, similar to those in the disposal of the ceded lands in Gregory County, S.D. * * *."[56] Committee action on the bills was delayed pending the outcome of the negotiations,[57] which were conducted by the Inspector at Rosebud Agency on December 14, 15, 19 and 20, 1906 and again on January 17, 18 and 21, 1907.[58] The bill introduced by Congressman Burke formed the framework of the discussions.[59] To its proposals the Indians drafted counter proposals, providing, *inter alia*, for higher prices to homesteaders and for the accumulation of proceeds in an interest bearing fund.[60] A final agreement was reached January 21, 1907 and was ultimately signed by a majority (though not three-fourths) of the eligible Indians.[61]

Article I of the 1907 Agreement provides that the Indians,

for the consideration herein named and in the manner hereinafter provided, do hereby cede, grant, and relinquish to the United States all claim, right, title and interest in and to all that part of the Rosebud Indian Reservation lying South of Big White River and east of range twenty-five west, of the sixth principal meridian in South Dakota, except such portions thereof as have been, or may hereafter be, alloted to Indians. * * *[62]

The United States was to purchase the school lands outright, and to act as trustee for the sale of the remaining lands to homesteaders at specified prices.[63] Provision was made for completing and changing the allotments to Indians, and for the disposition of the proceeds (including accumulation in an interest bearing fund).[64]

The Secretary of the Interior recommended that Congress ratify the Agreement,[65] and on February 18, 1907 the Senate Committee on Indian Affairs reported a ratification bill as a substitute

55. 41 Cong.Rec. 15 (1906) (Burke bill, H.R. 20547); 41 Cong.Rec. 50–51 (1906) (Gamble bill, S. 6618).

56. Letter from F. E. Luepp, Commissioner of Indian Affairs to Inspector James McLaughlin, December 5, 1906 at 1, 2–3, 5; 3 App. at 166, 167–68, 170.

57. 41 Cong.Rec. 3182 (1907) (remarks of Senator Gamble); Letter from E. A. Hitchcock, Secretary of the Interior, to Chairman Committee on Indian Affairs, House of Representatives, February 14, 1907, in H.R.Rep.No.7613, 59th Cong., 2d Sess. 4 (1907).

58. *Proceedings of a Council held at Rosebud Agency, S.D. with the Indians of the Rosebud Reservation, December 14, 1906*, 3 App. at 176–269.

59. *Id.* at 2–3, 11, 12; 3 App. at 177–78, 186, 187.

60. *E. g., id.* at 43–47, 49; 3 App. at 218–22, 224.

61. Letter from James McLaughlin to the Secretary of the Interior, February 12, 1907 at 1, 4, 3 App. at 270, 273; Letter from E. A. Hitchcock, Secretary of the Interior, to the Chairman Committee on Indian Affairs, House of Representatives, February 14, 1907 (enclosing agreement) in H.R.Rep.No.7613, 59th Cong., 2d Sess. 5, 7 (1907).

62. Letter from E. A. Hitchcock, Secretary of the Interior, to the Chairman, Committee on Indian Affairs, House of Representatives, February 14, 1907 (enclosing agreement) in H.R. Rep.No.7613, 59th Cong., 2d Sess. 5 (1907).

The described area includes a small corner of Lyman County.

63. *Id.* at 5, 6, 7.

64. *Id.* at 6.

65. *Id.* at 4.

for the original Gamble bill.[66] By this time, however, the House had already debated and passed a second Burke bill which incorporated substantially the terms of the agreement without reference to it.[67] Senator Gamble immediately steered the House bill through the Senate [68] and it passed without debate, with, however, an amendment which provided for five percent instead of three percent interest on the accumulated fund in conformity with the 1907 Agreement.[69] The Senate receded from its amendment in conference,[70] and the bill became law March 2, 1907.[71]

As noted, the House bill was not in form a ratification of the 1907 Agreement.[72] In place of the Agreement's language of cession quoted above, the Act provides that the "Secretary of the Interior be, and he is hereby, authorized and directed, as hereinafter provided, to sell or dispose of" the described unallotted lands.[73] With the exception of the reduction of the interest rate from five to three percent, the substantial terms of the Agreement are contained verbatim in the Act.[74] The Act contains additional language granting the school lands to the State of South Dakota,[75] and appropriating funds for the purchase of the school lands and for making the allotments provided therein.[76]

The 1907 Act is, in substance, identical to the 1904 Act: Congress directs that, with the exception of school lands, the unallotted lands in the described tract be offered for sale to homesteaders at specified prices; [77] the United States is to act as trustee for the Indians to dispose of said lands and to collect and dispense the proceeds; and the United States is to purchase and convey the school lands to the State of South Dakota.

Nothing in the language of the 1907 Act or in the surrounding circumstances and legislative history indicates a change in that congressional determination to alter the reservation boundaries which we have found in the 1904 Act.[78]

This continuity of purpose was expressed by Congressman Burke on the floor of the House:

> Mr. Speaker, the bill has the unanimous report of the Committee on Indian Affairs, in which committee it was very carefully considered. The bill is

---

66. S.Rep.No.6831, 59th Cong., 2d Sess. (1907).

67. 41 Cong.Rec. 3103–05 (1907) (H.R. 24987); see H.R.Rep.No.7613, 59th Cong., 2d Sess. 3 (1907).

68. On February 18 Senator Gamble brought the bill to the floor of the Senate and attempted its passage; objection was raised that it had not yet been to committee, and it was so referred. 41 Cong.Rec. 3182–83 (1907). Senator Gamble reported it from the Committee on Indian Affairs the next day, S.Rep.No.6838, 59th Cong., 2d Sess. (1907), whereupon it passed the Senate. 41 Cong.Rec. 3323 (1907).

69. 41 Cong.Rec. 3323 (1907); see 41 Cong.Rec. 3182 (1907); S.Rep.No.6838, 59th Cong., 2d Sess. 1 (1907).

70. 41 Cong.Rec. 3996 (1907).

71. Act of March 2, 1907, ch. 2536, 34 Stat. 1230.

72. The following exchange occurred during the House debate:

> Mr. FITZGERALD. The Commissioner of Indian Affairs recommended that all after the enacting clause be stricken out and the agreement be inserted and ratified. That has not been done, and that has not been the practice for several years. I wish to ask this question: Have the provisions of the treaty been inserted in this bill?
> Mr. BURKE of South Dakota. I may say to the gentleman that they have been.
41 Cong.Rec. 3104 (1907).

73. 1907 Act § 1, 34 Stat. 1230.

74. There are further differences between the Agreement and the Act which neither party has stressed.

75. 1907 Act §§ 1, 6, 34 Stat. 1230, 1231.

76. 1907 Act § 7, 34 Stat. 1231–32.

77. Six dollars per acre for lands entered within the first three months, four dollars and fifty cents per acre for lands entered during the second three months, and two dollars and fifty cents per acre for lands entered thereafter. 1907 Act § 3, 34 Stat. 1230–31.

78. Since the Tribe urges that the 1904 Act did not alter the boundaries, it does not contend that any change of purpose is evinced by the 1907 Act.

substantially in accordance with an agreement which has just been made with the Indians, signed by forty-two more than a majority of the male Indians over the age of 18 years. It is in line with the recent bills that have been passed affecting the sale of the Indian reservations. It is along the line of the bill which passed in the Fifty-eighth Congress for the sale of that portion of this same reservation that is located in Gregory County. The maximum price of the land in that bill was fixed at $4 per acre, while the maximum price in this bill is $6 per acre.

The Indians, as I have stated before, have agreed to the disposition of it under the terms of the bill. They will have left, after this land is disposed of, *a reservation that is substantially 50 miles square,* and there are only 5,000 Indians.

41 Cong.Rec. 3104 (1907) (Emphasis added).

The continuity is further evidenced by the House and Senate Reports which note that the "sale and disposition of the lands in Gregory County have proven very satisfactory" and are substantially completed.[79] These reports also cite as precedent supporting the school lands provision, all prior acts opening reservations in South Dakota (including the 1904 Gregory County Act).[80] The 1907 Act was clearly presented to Congress generally as one of a series of bills effecting the sale of Indian reservations, and specifically as a continuation of the process of diminishing the Rosebud Res-

ervation begun with the 1904 Gregory County Act.

It is evident as well that this continuity was perceived by the Rosebud Indians. As the trial court observed, "[i]t is difficult for one to read the transcript of the negotiations in 1906 without feeling that this was merely a continuation of the original negotiation in 1901 which culminated in the Gregory County act, the 1904 Act, discussed above." [81] We need simply note that the 1907 Agreement is similar in form to the 1901 Agreement, was negotiated between the same parties, and contains similar language of cession.

Further, the language and legislative history of the 1907 Act affirmatively indicate that the Act was intended to alter the reservation boundaries. That Gregory County was no longer considered within the boundaries of the reservation is clear from the description of the tract to be sold or disposed of under the 1907 Act, the purpose of which was "to authorize the opening and sale of that portion of the Rosebud Reservation in South Dakota known as Tripp County." [82] Said tract is described as:

all that portion of the Rosebud Indian Reservation in South Dakota lying South of Big White River and east of range twenty-five west of the sixth principal meridian. * * * [83]

Not only Tripp County, but Gregory County would fall within this description unless it (Gregory County) was not considered a "portion of the Rosebud Indian Reservation." It clearly was not. As the House and Senate reports state:

---

**79.** H.R.Rep.No.7613, 59th Cong., 2d Sess. 2 (1907); S.Rep.No.6838, 59th Cong., 2d Sess. 1 (1907) (quoting House Report).

**80.** H.R.Rep.No.7613, 59th Cong., 2d Sess. 3–4 (1907); S.Rep.No.6838, 59th Cong., 2d Sess. 3 (1907) (quoting House Report).

As in 1904 the school lands provision was based on the South Dakota enabling act, and is further evidence of the intent to extinguish the reservation in Tripp County. H.R.Rep.No. 7613, 59th Cong., 2d Sess. 3–4 (1907); S.Rep. No.6838, 59th Cong., 2d Sess. 3 (1907) (quot-

ing House Report). See our discussion of the 1904 school lands provision, *supra* at 99–101.

**81.** *Rosebud Sioux Tribe v. Kneip,* 375 F.Supp. 1065, 1075 (D.S.D.1974).

**82.** H.R.Rep.No.7613, 59th Cong., 2d Sess. 1 (1907); S.Rep.No.6838, 59th Cong., 2d Sess. 1 (1907) (quoting House Report).

**83.** 1907 Act § 1, 34 Stat. 1230.

[The 1904 Act authorized] a sale of so much of this same reservation as *was* located in Gregory County, the tract affected being about one-half the area embraced in the tract affected by the pending bill and lying immediately adjoining and east of Tripp County. [Emphasis added.] [84]

These materials concerning the description of the tract affected by the 1907 Act not only provide a contemporaneous and authoritative construction of the 1904 Act which supports our interpretation thereof, but also directly indicate, in light of the continuity discussed above, that the 1907 Act was similarly intended to further constrict the boundaries of the Rosebud Reservation.

This intent was given firm expression by Congressman Burke during the House debate, whose remarks are unambiguous:

They will have left, after this land is disposed of, a reservation that is substantially fifty miles square. * * * [85]

The allotment provisions of the 1907 Act are asserted by the Tribe to support its position against disestablishment. The 1907 Act, provided, with respect to allotments, as follows:

That prior to the said proclamation the Secretary of the Interior, in his discretion, may permit Indians who have an allotment within the Rosebud Reservation to relinquish such allotment and to receive in lieu thereof an allotment anywhere within said reservation * * *.

1907 Act § 2, 34 Stat. 1230.

The Tribe argues that the provision respecting allotments "anywhere within said reservation," which then included Tripp County, clearly negates a congressional intent "to dissolve the reservation status of the Tripp county portion of the reservation" since, it argues, had dissolution been intended, Congress "hardly would have provided for 160 acre allotments anywhere on the reservation, including Tripp county."

The argument stems from a misinterpretation of the legislative history. Inspector McLaughlin's letter of instructions from the Commissioner of Indian Affairs stated that:

The Office is in receipt of a communication of November 22 from Hon. Charles H. Burke, wherein he says that he recently visited the Rosebud Reservation for the purpose of gaining information with a view to preparing a bill for the sale of that part of the reservation located in Tripp County; that he found that a large number of Indians had taken allotments in the western and southwestern parts of the reserve, on lands which are now, and always will be, worthless, being nothing but sandhills; that the Indians who have allotments in the reservation elsewhere than in Tripp County should be permitted, in the discretion of the Secretary of the Interior, to relinquish them and to take allotments in lieu thereof in some other part of the reservation, including Tripp county. * * * [86]

The Inspector, in negotiating with the Indians, accordingly informed them of their rights to reallotment anywhere on the reservation,[87] and the specific men-

---

**84.** H.R.Rep.No.7613, 59th Cong., 2d Sess. 1–2 (1907); S.Rep.No.6838, 59th Cong., 2d Sess. 1 (1907) (quoting House Report).

**85.** 41 Cong.Rec. 3104 (1907). Todd and Mellette Counties make up a generally square area, roughly fifty miles on a side.

**86.** Letter from F. E. Leupp, Commissioner of Indian Affairs, to Inspector James McLaughlin, December 5, 1906 at 4, 3 App. at 169.

**87.** [INSPECTOR McLAUGHLIN:] 8th. You ask that those entitled to allotments, but

have not yet taken them, be allotted, of which there are about 80 in all. In answer to that I will say there will be no difficulty in that. All beneficiaries of the reservation who have not yet received allotments can be allotted before Tripp County is opened to settlement, and they can take them anywhere on the reservation, including Tripp County. There will be a provision in the agreement to that effect.

9th. You desire that applications now pending before the Indian Office asking to be permitted to change present location of

tion of Tripp County in this connection was to remedy, "before the opening of Tripp County," the prior taking of poor land. There is no negation here of congressional intent to disestablish. The entire tenor of the negotiations and the contemporary documents are consistent with a congressional intent to extinguish the reservation status of the County rather than the contrary.

After careful review we conclude that the language, legislative history and circumstances surrounding the passage of the 1907 Act, like the 1904 Act, clearly indicate a congressional determination to terminate the reservation in the counties affected by the Act.[88]

Continued pressure for additional land, the "march of progress and civilization westward" in the language of the times, resulted in the passage of the Act of May 30, 1910, ch. 260, 36 Stat. 448. Unlike the 1904 Act and the 1907 Act, the 1910 Act was not preceded by formal negotiations and agreement with the Rosebud Indians. In the waning months of the 60th Congress Senator Gamble introduced and reported from committee a bill to open all the unallotted lands in Mellette County and in a strip of land in the eastern part of Todd County.[89] The bill was reported favorably despite the opinion of the Secretary of the Interior that "the views of the Indians should be procured before the bill is finally acted on," and his recommendation "that the strip of land on the east of *the present diminished reservation* should [not] be opened yet." [90] Senator Gamble was unable to obtain the Senate's consideration of the bill before the term of Congress expired,[91] but shortly thereafter, in March and April, 1909, Inspector McLaughlin conducted discussions with the Rosebud Indians concerning the Gamble bill. At first the Indians were opposed to the bill,[92] but later many expressed a willingness to part with Mellette County, provided the terms were favorable.[93] They remained opposed, however, to the opening of the eastern part of Todd County.[94] Inspector

allotments be acted on before the opening of Tripp County. I can promise to incorporate that provision in the agreement, and you people will be fully protected in that. As I previously stated, it would doubtless take a couple of years to bring about the opening of Tripp County. These allotments are what would delay it. We will incorporate in the agreement a provision that Tripp County shall not be opened until all the children born up to the ratification of the agreement, who have not received allotments, shall be allotted 160 acres each. These two items are already covered by the Burke Bill, which provides for relinquishments and reallotments and allotment to children, and giving the right to take such allotments in Tripp County.

*Proceedings of a Council held at Rosebud Agency, S.D. with the Indians of the Rosebud Reservation, December 14, 1906* at 17–18, 3 App. at 192–93.

**88.** Subsequent enactments by the Congress itself provide an authoritative contemporary construction of the 1907 Act which supports this conclusion.

By the Act of August 17, 1911, ch. 22, 37 Stat. 21 Congress granted to "any person who has heretofore made a homestead entry for land in *what was formerly a part of the Rosebud Indian Reservation,* in the State of South Dakota, authorized by [the 1907 Act,]" an ex-

tension of time within which to make his payments. (Emphasis added.)

By the Act of January 11, 1915, ch. 8, 38 Stat. 792 Congress disposed of certain mineral lands "*in Tripp County in what was formerly within the Rosebud Indian Reservation* in South Dakota, as have heretofore been opened to settlement and entry under Acts of Congress which did not authorize the disposal of such mineral lands * * * ." (Emphasis added.)

**89.** 43 Cong.Rec. 65 (1908) (S. 7379 introduced); S.Rep.No.887, 60th Cong., 2d Sess. (1909).

**90.** Letter from J. R. Garfield, Secretary of the Interior, to R. J. Gamble, U. S. Senate, January 26, 1909 in S.Rep.No.887, 60th Cong., 2d Sess. 3 (1909) (Emphasis added).

**91.** *See* 45 Cong.Rec. 1679 (1909).

**92.** *Transcript of Council held at Rosebud Agency, March 11, 1909,* 3 App. at 293–300. McLaughlin, formerly known to the Sioux as "White Head," was given a new name by High Pipe: *"The man who bothers his friends for more land." Id.* at 4, 3 App. at 296.

**93.** *Proceedings of Council held with the Indians of the Rosebud Reservation, April 21 & 26, 1909* at 6–8, 11, 20–27; 3 App. at 306–08, 311, 320–27.

**94.** *Id.*

McLaughlin did not seek to negotiate an agreement with the Indians, but reported to the Secretary of the Interior his opinion that a "large majority" of the Rosebud Indians were favorable to the opening of Mellette County under the provisions of the Gamble bill.[95]

Both Congressman Burke and Senator Gamble introduced bills in the 61st Congress similar in purpose to the original Gamble bill.[96] In January, 1910 the Secretary of the Interior recommended that only Mellette County be opened but not the eastern part of Todd County.[97] He also proposed the inclusion of a provision (which will be hereinafter discussed) prohibiting the introduction of intoxicants into the affected lands.[98] The Senate bill was reported and passed with amendments implementing the Secretary's proposals.[99] It then passed the House with amendments and, after conference to reconcile House and Senate differences not material here, the bill became law May 30, 1910.[100]

The 1910 Act is substantially similar to the 1907 Act. Its operative language is identical:

> That the Secretary of the Interior be, and he is hereby, authorized and directed, as hereinafter provided, to sell or dispose of all that portion of the Rosebud Indian Reservation [described by metes and bounds], except such portions thereof as have been or may be hereafter allotted to Indians. * * [101]

The lands affected are those in the present day Mellette County, which lies north of Todd County and west of Tripp County.

It was provided that after allotments within the affected area had been completed, the lands should be opened to settlement and entry under the general homestead and town-site laws by proclamation of the President.[102] Unlike the 1907 and 1904 Acts, which fixed the prices to be paid by homesteaders, the 1910 Act provided for the classification and "appraisement" of the lands, and for their sale at the appraised prices.[103] It also provided for the surveying of townsites and the sale of town lots.[104]

The Act also contained the familiar school lands provision by which the United States purchases and grants to South Dakota two sections in each township for the use of the common schools.[105] As in the 1904 and 1907 Acts, the United States was not otherwise obligated to purchase, but was to act as trustee for the purpose of sale and to collect and disburse the proceeds.[106]

The 1910 Act contains two further provisions which, because of their language and history are of peculiar relevance to the problem before us. The

95. Letter from James McLaughlin to the Secretary of the Interior, April 29, 1909 at 4, 3 App. at 332.

96. 44 Cong.Rec. 132 (1909) (S. 183); 44 Cong. Rec. 2013 (1909) (H.R. 9544); 45 Cong.Rec. 10 (1909) (H.R. 12437).

97. See Letter from R. A. Ballinger, Secretary of the Interior, to Moses E. Clapp, Chairman Committee on Indian Affairs, U.S. Senate, January 13, 1910 in S.Rep.No.68, 61st Cong., 2d Sess. 4 (1910).

98. Id. at 5.

99. S.Rep.No.68, 61st Cong., 2d Sess. (1910); 45 Cong.Rec. 1065, 1066, 1075 (1910).

100. Act of May 30, 1910, ch. 260, 36 Stat. 448; 45 Cong.Rec. 6437 (1910) (Conference Report passes House); 45 Cong.Rec. 6326 (1910) (Conference Report passes Senate); 45 Cong. Rec. 5473 (1910) (S. 183 passes House); see H.R.Rep.No.429, 61st Cong., 2d Sess. (1910).

101. 1910 Act § 1, 36 Stat. 448–49; see 1907 Act § 1, 34 Stat. 1230. The 1910 Act further excepts from sale lands classified as "timber lands," and authorizes the Secretary to reserve from sale lands "he may deem necessary for agency, school, and religious purposes." 1910 Act § 1, 36 Stat. 449.

102. 1910 Act § 2, 36 Stat. 449.

103. 1910 Act §§ 4, 5, 36 Stat. 450.

104. 1910 Act § 3, 36 Stat. 449–50.

105. 1910 Act § 8, 36 Stat. 451.

106. 1910 Act § 11, 36 Stat. 451–52.

first, a proviso in section 1 of the Act, permits an Indian who has taken an allotment "on the tract to be ceded" to substitute therefor an allotment "on the diminished reservation." [107] The second, section 10 of the Act, subjects the affected tract for twenty-five years "to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country." [108] These provisions will be discussed more fully below.

Again, we find nothing in the language of the 1910 Act or in the surrounding circumstances and legislative history which indicates a change in that congressional determination to alter the reservation boundaries which we have found in the 1904 and 1907 Acts.[109] We deem it unnecessary to detail *in extenso* the legislative history and surrounding circumstances evidencing the general continuity of purpose among the Rosebud acts.[110] The sponsors of the 1910 Act placed the bill in the context of the westward expansion which began with the breakup of the Great Sioux Reservation:

> Mr. GAMBLE. Mr. President, I have apologized many times for taking the time of the Senate, but twenty years ago practically the entire western half of the State was an Indian reservation. It has been opened gradually and by degrees. The Indian reservations have stood as a menace to the development and the growth of the Commonwealth. The Indians themselves agreed to the provisions of this bill after it had been submitted to them for their consideration. The department agreed to it. It follows in line, Mr. President, with all of the measures providing for opening reservations in the Western States.[111]

The only change in policy [112] noted during the debates was the change in the method of payment which was instituted with the 1904 Act.[113] McLaughlin's new

---

**107.** 1910 Act § 1, 36 Stat. 449.

**108.** 1910 Act § 10, 36 Stat. 451.

**109.** See note 78 *supra.*

**110.** *E. g.,* 45 Cong.Rec. 5456–57 (1910) (remarks of Congressman Burke).

**111.** 45 Cong.Rec. 1074 (1910). The remark that the Indians had agreed to the provisions of the bill is, at best, an overstatement.

**112.** The Dawes Act, the Act of February 8, 1887, ch. 119, 24 Stat. 388, expressed the philosophy of the era. It represented an effort to compromise the Government's responsibility to the Indians for their welfare, with the ever increasing pressures, to which we have heretofore made reference, for the opening of the land to settlers. It authorized allotments to the Indians and sale, with the tribes' consent, of the remaining "surplus" lands, the proceeds being reserved for the benefit of the Indians.

The chief advantages that the new system was to bring to the country as a whole were to be found in the opening up of surplus lands on the reservations * * *. In his report of 1880, [Interior] Secretary Schurz wrote:

"[Allotment] will eventually open to settlement by white men the large tracts of land now belonging to the reservations, but not used by the Indians. It will thus put the relations between the Indians and their white neighbors in the western country upon a new basis, by gradually doing away with the system of large reservations, which has so frequently provoked those encroachments which in the past have led to so much cruel injustice and so many disastrous collisions."
F. Cohen, *Handbook of Federal Indian Law* 208–09 (1942) (quoting Otis study) (footnote omitted).

**113.** As stated by Congressman Burke:
The original treaty made in 1889 with these Indians provided expressly that after the lands had been allotted to the Indians the surplus lands should then be disposed of under the provisions of the homestead law.

＊　＊　＊　＊　＊　＊

I might say, Mr. Speaker, that there are two propositions to be considered in disposing of the unallotted and unused lands on Indian reservations. One is, at the earliest possible date, to get among the Indians the white man, and have those lands that are of no benefit to anyone, that are lying idle, doing no good, opened up and developed into farms, and I believe that the placing through *what were heretofore reservations* actual settlers will have the effect of civilizing the Indians who will have allotments and also give value to these allotments which at present are of very little value.
45 Cong.Rec. 5457 (1910) (Emphasis added).
Senator Crawford emphasized the new method of payment:

name, *"The man who bothers his friends for more land,"* attests to the continuity as perceived by the Rosebud tribe.

Further, there are clear indications in the legislative history of the 1910 Act that Congress understood that the 1904 and 1907 Acts had altered the reservation boundaries and that such would be the effect of the bill before it.[114] Significantly, the Tribe offers no explanation of how the boundaries of the reservation could remain inviolate while the area contained therein was shrinking from 3,000,000 acres to 1,000,000 acres as outlined in the House report:

> The Rosebud Indian Reservation when set aside as a separate reservation under the Sioux act of 1889 contained something over 3,000,000 acres of land. In 1904 the unused and unallotted portion of the reservation in Gregory County, about 500,000 acres, was disposed of and the Indians received therefrom something more than $1,500,000. In the Fifty-ninth Congress a law was enacted authorizing the sale of the unused and unallotted lands in that portion of the reservation in Tripp County, comprising about 1,000,000 acres, under a bill substantially in the same form as the bill now under consideration, except that the price of the land was fixed in the law, whereas under this bill the price is to be fixed by appraisement. The proclamation for the disposition of Tripp County lands was not issued until last year, and therefore it was not subject to filing until that time. A very large part of the lands has been entered under the homestead laws, but it is not possible to state just how much will be received from the sale of the lands in Tripp County; it will, however, undoubtedly amount to $4,000,000.
>
> The area comprised in the present bill is about 800,000 acres and the proceeds from the sale thereof, under the terms of the bill, will probably amount to $3,000,000. There will still be left a reservation containing about 1,000,000 acres, and as the Indians have all been allotted there is no occasion for continuing a reservation larger than it will be when Mellette County is disposed of.

H.R.Rep.No.429, 61st Cong., 2d Sess. 2 (1910).[115]

Mr. President, this bill was introduced by my colleague, and he is in charge of it, but it is one of interest to my State, * * *. I have lived in the West all my life, and I have lived in South Dakota half of my life. It was a Territory when I went there, and almost all the west half of it was an Indian reservation, occupied by the Sioux Indians.

By treaties negotiated from time to time, and by laws enacted from time to time, the area of lands occupied by the Indians has gradually narrowed to smaller and smaller limits, until now the lands owned by the Indians are comparatively small in quantity. They are not lands which in their possession bring any revenue whatever. They do not cultivate them. There is neither fish nor game upon them. The policy of the Government toward the Indians and toward these lands has changed in more recent years simply in this respect—that the lands be sold and the proceeds made into a trust fund, the principal forever held inviolate and the income from which is devoted to the Indians.

When these lands under this bill and similar bills are thrown open to settlement, the Indian first selects by allotment the portion he is allowed to take upon the abandonment of his tribal relations, and the balance is sold to the settler, who must first make entry and settlement and comply with the provisions of the law and then pay the Government, and the proceeds go into the fund for the Indians.

45 Cong.Rec. 1068 (1910).

114. Thus we need not rely merely on such references to "the present diminished reservation" or to "what were heretofore reservations" as appear with some frequency throughout the 1910 materials and some of which we have quoted above with emphasis.

115. The Senate report similarly contemplates a change in the size of the reservation:

> The *present* area of the Rosebud Indian Reservation aggregates about 1,800,000 acres. The lands proposed to be opened to settlement under the provisions of this bill embrace an area of about 830,000 acres. It is the understanding of your committee that practically all the allotments to adult Indians on this reservation have been made. Provision has been made under recent statutes for the allotment of all the minor children on the reservation, and this work is now in progress and it is understood that practically

We agree with the trial court[116] that this statement affords strong support for the conclusion that the three acts before us altered the reservation boundaries.[117]

We have discussed heretofore the school lands provision of the 1904 and 1907 Acts. The provision before us, section 8 of the 1910 Act, is substantially identical to those of 1904 and 1907. It was similarly justified as required to "keep good the pledge" in the South Dakota enabling act,[118] and is further evidence that the 1910 Act was intended to extinguish the Reservation in Mellette County.[119] Two other provisions unique to the 1910 Act, the substitute allotment provision and the intoxicants provision, confirm this conclusion.

Section 1 of the 1910 Act contains the following proviso:

> *Provided,* That any Indians to whom allotments have been made on the tract to be ceded may, in case they elect to do so before said lands are

offered for sale, relinquish same and select allotments in lieu thereof on the diminished reservation * * *. 36 Stat. 449. The Tribe urges that "diminished reservation" refers to Mellette County;[120] it argues that this proviso and the clause requiring the completion of allotments in Mellette County[121] indicate an intent to continue Mellette County as a reservation. In the light of the history of this legislation, and its background,[122] we do not think the fact that Indian allottees would continue to live in Mellette County is persuasive to the point that the county would remain within the reservation. Further we find that the phrase "diminished reservation" in context is distinguished from "the tract to be ceded," and that it clearly refers to Todd County, the remaining unopened reservation.[123] This statutory use of the phrase "diminished reservation" confirms our view that the reservation was "diminished" in a geographical sense (by an alteration of the boundaries) and not in the weaker sense urged

all such allotments have been made to those so desiring allotments within the area described in section 1 of this bill.

The reservation is *yet* large, and in the judgment of your committee the surplus and unallotted lands are unnecessary for the use of the Indians, and the opening of the reservation would result in a large increase in the settlement and the development of that part of the State, and would enhance to a very large extent the holdings of the Indians. S.Rep.No.68, 61st Cong., 2d Sess. 2 (1910) (Emphasis added).

**116.** *Rosebud Sioux Tribe v. Kneip,* 375 F.Supp. 1065, 1079 (D.S.D.1974).

**117.** While not technically evidence of congressional intent in 1904 and 1907, the statement is an authoritative contemporary construction of the two prior acts.

**118.** 45 Cong.Rec. 1068 (1910) (remarks of Senator Crawford). *See* S.Rep.No.68, 61st Cong., 2d Sess. 3 (1910); H.R.Rep.No.429, 61st Cong., 2d Sess. 2 (1910); 45 Cong.Rec. 1067–68, 1071 (1910) (remarks of Senators Davis and Crawford); 45 Cong.Rec. 5472 (1910) (remarks of Congressman Burke).

**119.** See our discussion at 99–101, *supra.*

**120.** *See United States ex rel. Condon v. Erickson,* 478 F.2d 684, 687 (8th Cir. 1973).

**121.** Section 2 of the 1910 Act contains the following proviso:

*Provided,* That prior to said proclamation [opening the reservation] the allotments within the portion of the said Rosebud Reservation to be disposed of as prescribed herein shall have been completed * * *. 36 Stat. 449.

**122.** *E. g.,* the Act of March 2, 1889, ch. 405, 25 Stat. 888, the "Crooks Treaty" which carved the Great Sioux Reservation into separate smaller reservations. Under the terms of the Act Indians who had taken allotments on lands in the area between the described reservations were permitted to remain there, although the area was restored to the public domain and opened to settlement. *Id.* §§ 15, 21, 25 Stat. 893, 896.

**123.** This contrasts with the language and history of the 1907 Act discussed *supra* at 106–107. We note that when a similar provision was inserted in a subsequent bill proposing the opening of Todd County, the Department of Interior recommended its excision, stating:

If the bill becomes law, it will provide for opening all the lands now constituting the diminished Rosebud Reservation, and there will, therefore, remain no further diminished reservation.

Letter from S. Adams, First Assistant Secretary, Dept. of the Interior, to R. J. Gamble, Chairman Committee on Indian Affairs, U. S. Senate, April 30, 1912 in S.Rep.No.1166, 62nd Cong., 3d Sess. 4 (1913).

(by the loss of tribal title to lands remaining within the reservation).[124]

We also find it significant that although the 1910 Act does not contain the language of cession found in the 1904 Act, it nevertheless refers to Mellette County as "the tract to be ceded." Evidently Congress had not changed its purpose and still considered the 1910 Act to effect a cession of Indian lands.

Section 10 of the 1910 Act provides:

That the lands allotted, those retained or reserved, and the surplus land sold, set aside for town-site purposes, granted to the State of South Dakota, or otherwise disposed of, shall be subject for a period of twenty-five years to all the laws of the United States prohibiting the introduction of intoxicants into the Indian country.[125]

In 1910 there was an outstanding federal prohibition against the introduction or attempted introduction of intoxicants into "Indian country."[126]

The trial court held that thus subjecting the Mellette County land to the liquor proscription applicable to "Indian country" manifested a congressional intent that the County would henceforth not be Indian land, since, if it were, there would be no need for the proscription.[127] The court also noted the power of Congress to impose liquor restrictions on ceded lands adjoining Indian country in order to prevent white-Indian border traffic in liquor.[128] The Tribe takes the contrary view, arguing principally that in view of the 1910 construction of "Indian country," Section 10 was intended not to diminish but to enlarge "the protection attaching to the reservation." Assuming, arguendo only, a possible ambiguity in the statute, we turn again to the legislative history for the congressional intent.

Section 10, modeled after the provision in a congressionally ratified cession agreement with the Nez Perce Indians which was upheld by the Court in *Dick v. United States,* 208 U.S. 340, 28 S.Ct. 399, 52 L.Ed. 520 (1908),[129] was vigorously debated in the House.[130] Its opponents contended that under *In re Heff,* 197 U.S. 488, 25 S.Ct. 506, 49 L.Ed. 848 (1905)[131] the provision was *ultra vires* since the Rosebud Indians, by taking allotments, had become citizens of the United States subject to the laws of South Dakota and free from the police power of Congress.[132] The proponents, on the other hand, considered the provision a valid condition on the sale of the land and were corrected when they referred to the land as on or within the boundaries of the reservation:

Mr. GOEBEL. I am opposed to attaching to the sale of any reservation conditions such as are proposed in this bill.

Mr. GRONNA. Does the gentleman believe it would be safer on a reservation where liquors are permitted to be sold? Would the gentleman not buy land on a reservation where protection is given by the Government, even if such reservation is located in a prohibition State?

Mr. GOEBEL. Oh, I do not know what I would do. At present I would want to get the land without any conditions attached. *You must also bear in mind that when the lands are sold there is no longer a reservation,* and the laws of the States apply.

124. See our discussion of this point in connection with the surrounding circumstances and legislative history of the 1904 Act *supra* at 99.

125. 36 Stat. 451.

126. Act of July 23, 1892, ch. 234, 27 Stat. 260; *see generally* Dept. of the Interior, *Federal Indian Law* 381–82, 386–87, 390 (1958).

127. *Rosebud Sioux Tribe v. Kneip,* 375 F.Supp. 1065, 1080 (D.S.D.1974).

128. *Id.*

129. *See* Letter from R. A. Ballinger, Secretary of the Interior, to Moses E. Clapp, Chairman Committee on Indian Affairs, U.S. Senate, January 13, 1910 in S.Rep.No.68, 61st Cong., 2d Sess. 5 (1910); H.R.Rep.No.429, 61st Cong., 2d Sess. 3 (1910); 45 Cong.Rec. 5473 (1910) (remarks of Congressman Burke).

130. 45 Cong.Rec. 5460–64, 5473 (1910).

131. *Heff* was overruled by *United States v. Nice,* 241 U.S. 591, 601, 36 S.Ct. 696, 60 L.Ed. 1192 (1916).

132. 45 Cong.Rec. 5460, 5462–64 (remarks of Congressmen Bartholdt and Goebel).

\*   \*   \*   \*   \*   \*

Mr. BUTLER. \* \* \* The Indian should not be tempted, if it is possible to keep the tempter away from him. Rum should not be sold to him, and no one should be permitted or encouraged to make the sale to him. I can see no reason why the Government should not impose this condition upon this land.

Mr. MURPHY. Then we ought to make this just as strong as possible, ought we not?

Mr. BUTLER. Yes, sir. Make it as strong as possible. You can not make it too strong for me. Mr. Chairman, this land, as I understand, is within the boundaries of an Indian reservation. Is that right?

Mr. BURKE of South Dakota. Yes, sir.

Mr. BUTLER. It is proposed now to make a sale of it to somebody of some color, white or black, it does not matter. This being so, the Government has the right to impose at this time upon these titles this condition.

Mr. BARTHOLDT. *But if the lands are allotted it is no longer an Indian reservation.*

Mr. BUTLER. *If the lands are allotted it will be no longer an Indian reservation. If the land is sold it will be no longer an Indian reservation. It is where, as I understand, the Indian has always lived and where he is going to live, and I believe in keeping the sale of liquor out of his neighborhood* \* \* \*.

45 Cong.Rec. 5463–64 (1910) (Emphasis added).

It is highly significant that the proponents of the Section 10 acceded to the contention that the lands would no longer be an Indian reservation, and justified their position with the same argument used in *Dick, supra*—that the lands were in the neighborhood of the Indian where he would be likely to frequent.[133] There can be no doubt here as to intent. Both sides are explicit "that when the lands are sold there is no longer a reservation." Section 10 and its legislative history reflect a congressional understanding that the effect of the 1910 Act would be to terminate the reservation status of the Mellette County lands.

What we find here is the continuation of the policy, heretofore adopted and implemented, of reducing the size of the Rosebud Reservation in order to make a portion of its lands available to the new settlers. Again, the congressional motivations are clear, as is its intent.[134]

The Tribe has sought that we declare that the Acts of 1904, 1907, and 1910 did not alter the boundaries of the Rosebud Reservation as fixed by the General Crooks treaty of 1889. This we cannot do. We have reviewed with care the pressures for opening,[135] the legislative

---

133. In *Dick* the Court upheld the intoxicant provision as an exercise of Congress' treaty-making power and its power to regulate commence with the Indian tribes. *Dick v. United States*, 208 U.S. 340, 359, 28 S.Ct. 399, 52 L.Ed. 520 (1908). The Court quoted *United States v. Forty-Three Gallons of Whiskey*, 93 U.S. 188, 195, 23 L.Ed. 846 (1876):

"If liquor is injurious to them inside of a reservation, it is equally so outside of it, and why cannot Congress forbid its introduction into a place *near by, which they would be likely to frequent?*" \* \* \* "If Congress has the power" \* \* \* "to punish the sale of liquor anywhere to an individual member of an Indian tribe, why cannot it also subject to forfeiture liquor introduced for an unlawful purpose into territory in proximity to that where the Indians live? There is no reason for the distinction" \* \*. [Emphasis in original.]

340 U.S. at 357, 28 S.Ct. at 404. *See generally* Dept. of the Interior, *Federal Indian Law* 385 (1958).

*Dick* was specifically relied on by Congressman Burke in the debate, 45 Cong.Rec. 5473 (1910).

134. A subsequent enactment regarding Mellette County confirms this conclusion. By the Act of March 3, 1919, ch. 110, 40 Stat. 1320 Congress authorized the sale for cemetery purposes of a described "ten-acre tract within the *former Rosebud Indian Reservation in Mellette County,* South Dakota." (Emphasis added.)

135. The scenes upon opening are described in Smith, *New Town et al.: A Reply*, 18 S.D.L. Rev. 327, 332–33 (1973), and are indicative of the public pressures existing at the time:

By the time of the "opening" of Gregory County, congressional desire for Indian lands was reaching a crescendo. The Gregory County Act provided for approximately

histories of the Acts, their content, provisions, and contemporaneous construction, as well as their subsequent treatment and interpretation. Against this background it is clear beyond reasonable question that the Acts were passed with the intent of doing away with the Reservation in those portions affected by the opening of the lands for entry and settlement. The boundaries were thus necessarily altered.

The problems before the Congress at the turn of the century with respect to the western lands permitted no easy solutions. The choices were difficult but they were made by the representatives of the people and it is not our function to fashion a wiser course under the guise of interpretation.

Affirmed.

2,412 homesteads of 160 acres each. About a quarter of a million people descended upon the local land offices at Bonesteel, Fairfax, Chamberlain, and Yankton, and 106,308 of these completed applications to be eligible for these 2,412 homesteads. At the Yankton Office, where 57,434 applications were filed, the crowds . . . broke all previous records. Hundreds slept in line at the land office, day and night, for a considerable time, to be in readiness to make their filings. On one day in July nearly seven thousand people were thus registered. It was estimated that nearly one thousand people were in line one morning at one time, having slept there all night. At 4 o'clock in the morning the lines were joined by 1,000 more until they extended one block and a half from one office and nearly as far . . . at another office. A carload of ready eatables came from Sioux City and was sold to the men waiting in line. The rush in the city and especially on the trains was something that had never been witnessed before in this state.

The same is true for the Tripp County and Mellette County Acts. A total of 114,769 persons applied for 4,000 homesteads in Tripp County and a similar occurrence was the story of Mellette County. [Footnotes omitted.]